IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Rex Burkholder,                                   Case No. 3:09CV01878

           Plaintiff

v.                                                ORDER

Douglas E. Lumpkin,

           Defendant

This is a Medicaid case examining whether an institutionalized individual (plaintiff Rex Burkholder) receiving Medicaid-paid nursing home care lost the right to continuation of such care when, after receiving an inheritance, he immediately transferred the inherited assets to his wife Linda ("community spouse"). In light of that transfer, Ohio's Medicaid agency suspended payments to the nursing home pending recoupment of the transferred funds. The nursing home, which has not been paid, now desires to transfer him to a different facility.

Plaintiff seeks to enjoin defendant Douglas E. Lumpkin, in his official capacity as director of the Ohio Department of Job and Family Services ("Agency"), which is the state regulatory body charged with administering Medicaid, from continuing its suspension of Medicaid payments to the nursing home.

Jurisdiction is proper under 28 U.S.C. § 1331, because plaintiff brings this case under 42 U.S.C. § 1983 and the Supremacy Clause of the U.S. Constitution, U.S. Const. art. 4, cl. 2.[1] Plaintiff alleges that Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*, preempts Ohio's contrary Medicaid-implementation laws, specifically Ohio Admin. Code § 5101:1-39-07.

Pending are: 1) defendant's motion to dismiss plaintiff's complaint for failure to state a claim [Doc. 12]; 2) plaintiff's counter-motion for summary judgment [Doc. 13]; and 3) plaintiff's amended motion for a permanent injunction. [Doc. 20].

For the reasons stated below, I grant defendant's motion to dismiss, deny plaintiff's counter-motion for summary judgment, and deny plaintiff's amended motion for a permanent injunction.[2]

**Background**

In April, 2007, plaintiff applied for Medicaid assistance. To qualify, plaintiff and his wife spent down their combined resources from $62,524.43 to $25,282.04. Plaintiff transferred the remaining assets to his wife.[3]

---

[1] "The fact that federal law conditions State participation in the Medicaid program on the State's adoption of a Medicaid plan does not thereby transform provisions of a State's plan into federal law." *Concourse Rehab. & Nursing Ctr., Inc. v. DeBuono*, 179 F.3d 38, 44 (2d Cir. 1999). "Were it otherwise, federal jurisdiction could be invoked to review each claimed error in a State's administration of its Medicaid Plan, which would needlessly undermine State sovereignty." *Id.*
 The only enforceable right, therefore, is to a state plan that comports with federal requirements; Medicaid recipients cannot challenge a state's deviation from a plan which comports with federal law. *See Clifton v. Schafer*, 969 F.2d 278, 284-85 (7th Cir. 1992). A claim that a state has misapplied its plan does not present a federal question. *See Concourse Rehab.*, *supra*, 179 F.3d at 46.

[2] Plaintiff conceded at oral argument that there remain no disputed facts in this case, and that the facts as established at the state hearing decision are correct. Defendant agreed, except that it pled ignorance as to the way in which plaintiff's wife spent down the money she received.

[3] This latter amount is the amount plaintiff and his wife may retain under personalized Medicaid calculations determining their Community Spouse Resource Allowance ("CSRA"). 42 U.S.C. § 1396r-5(f); *see also* Ohio Admin. Code § 5101:1-39-36(C). Defendant does not allege that

2

In August, 2007, plaintiff's wife applied for Medicaid assistance. To qualify, plaintiff's wife spent down her resources to $3,000.

In October, 2007, the Agency approved plaintiff's Medicaid request and placed him on a home and community-based services waiver.

In May, 2008, the Agency approved plaintiff's wife's Medicaid request and enrolled her in a Medicaid Buy-In for Workers with Disabilities Program. This program permitted her to keep $10,000 in resources.

In October, 2008, plaintiff moved to Springview Manor Nursing Home. Medicaid paid the costs of plaintiff's nursing home care.

On November 5, 2008, plaintiff inherited a deed to real property from his mother's trust. The property had a value of $112,200.

On November 25, 2008, plaintiff transferred the real property to his wife through quit claim deed.

On January 14, 2009, plaintiff inherited $17,810 from his mother's trust in the form of an annuity payment. Plaintiff received the payment in his bank account, but transferred it to his wife's bank account the same day.

On February 11, 2009, plaintiff's wife sold the inherited real property for $135,000. She subsequently spent this money to pay off her home and her car, and to remodel her home. Plaintiff did not receive any proceeds. Because the inherited and transferred funds thus have been dissipated, the only means by which Medicaid can recoup those funds, if it is entitled to do so, is by means of the suspension which it has instituted.

---

this amount was incorrect or that this transfer was improper.

On April 15, 2009, the Agency accordingly mailed plaintiff a "Notice of Restricted Coverage," indicating its intent to stop paying for his nursing home from May 1, 2009, until April 30, 2011.

**Standard of Review**

Under Fed. R. Civ. P. 12(b)(6), I must dismiss plaintiff's complaint if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007). Plaintiff must offer "either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988). Although the factual allegations in a complaint need not be detailed, they must sufficiently "raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Assoc. of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007); *see also Twombly*, *supra*, 550 U.S. at 553-55.

In making this determination, I am to take all factual allegations in the complaint as true, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), and "draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). It is not my function, at this stage, to weigh evidence or evaluate credibility. *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995).

**Discussion**

Plaintiff argues that 42 U.S.C. § 1396p(c)(2)(B)(i) prohibits imposing any divestment penalty on an institutionalized spouse for transferring assets to a community spouse for the community spouse's "sole benefit." According to plaintiff, "[i]n attempting to prohibit transfers between spouses

4

[through application of Ohio Admin. Code § 5101:1-39-07], the Defendant is thwarting the purposes of the federal law and violating the Supremacy Clause." [Doc. 1, at 6].[4]

Defendant responds that Ohio law is consistent with federal law. It construes § 1396p(c)(2)(B)(i) to authorize, generally, transfers to spouses. It, however, contends that 42 U.S.C. § 1396r-5(f)(1) precludes the transfer of assets to the community spouse beyond the CSRA, and that § 1396r-5's supersession clause, § 1396r-5(a)(1), requires resolution of any inconsistency between it and § 1396p(c)(2)(B) in the former clause's favor.

Examining the statutory language, legislative history and relevant case law, I find that defendant's interpretation is correct.

### A. Statutory Language

### 1. § 1396p

### a. § 1396p(c)(1): The Base Limitation[5]

Section 1396p(c)(1)(A) of Title 42 of the U.S. Code states, in relevant part: "[T]he State plan must provide that if an institutionalized individual . . . disposes of assets for less than fair market

---

[4] Citing Ohio Admin. Code § 5101:1-39-27.5, plaintiff also argues that Ohio law permits his action because "the entire inheritance was used for the sole benefit of the community spouse in the same month of receipt." [Doc. 13, at 3].

Plaintiff misreads the Ohio Administrative Code provision at issue, which states: "A 'lump-sum payment' is income which is accrued over two or more months *or it is a money payment is not related to any time period, such as* a death benefit or *inheritance*. A nonrecurring lump-sum payment is considered unearned income unless otherwise exempted or excluded." Ohio Admin. Code § 5101:1-39-27.5 (emphasis added).

Plaintiff also appears to argue that he may transfer the CSRA amount multiple times. [Doc. 13, at 4-6]. He provides no authority for this allegation, and neither the statutory language nor any case supports this interpretation.

[5] This subsection correlates to Ohio Admin. Code § 5101:1-39-07(C).

value on or after the look-back date specified in subparagraph (B)(i), the individual is ineligible for medical assistance for services described in subparagraph (C)(i)."

Subparagraph (B)(i) defines the "look-back date" as thirty-six months prior to the first date on which an institutionalized individual applies for Medicaid assistance. § 1396p(c)(1)(B).

Subparagraph (C)(i) includes nursing facilities among the services described. § 1396p(c)(1)(C).

Subparagraph (E) discusses "the number of months of ineligibility under this subparagraph." § 1396p(c)(1)(E).

This subsection, therefore, requires a state to impose a period of ineligibility on an individual who disposes of assets for less than fair market value on or after the date specified by the calculation. This requirement begins prior to an individual's Medicaid eligibility determination. It does not end, at least not by its explicit terms, once the state decides eligibility initially. Courts, however, usually interpret this provision in the context of initial eligibility. *See, e.g.*, *James* ex rel. *James v. Richman*, 465 F. Supp. 2d 395, 403-04 (E.D. Pa. 2006).

Several cases refer to this period of ineligibility as a "penalty period":

> In order to prevent otherwise ineligible individuals from obtaining Medicaid benefits, Congress has enacted certain "transfer penalties" that apply to individuals who transfer away their resources to other persons for less than fair market value. Whenever a Medicaid applicant makes an uncompensated transfer of resources, the value of those resources are divided by the average monthly cost of nursing services. 42 U.S.C. § 1396p(c)(1)(A) & (B).

*Sorber v. Velez*, 2009 WL 3491154, at *1 (D.N.J.); *see also, e.g.*, *Johnson v. Guhl*, 357 F.3d 403, 410 (3d Cir. 2004); *Wong v. Daines*, 582 F. Supp. 2d 475, 480, 481 n.5 (S.D.N.Y. 2008).

While the statutory language and cases interpreting this provision thus primarily discuss this subsection in the context of an initial eligibility determination, neither make this limitation explicit.

### b. § 1396p(c)(2): The Exception[6]

Section 1396p(c)(2)(B)(i) of Title 42 of the U.S. Code, however, states, in relevant part: "An individual shall not be ineligible for medical assistance by reason of [§ 1396p(c)(1)] to the extent that . . . the assets . . . were transferred to the individual's spouse . . . for the sole benefit of the individual's spouse."[7]

It is arguable that the plain language of § 1396p(c)(2)(B)(i) does not precisely establish that which plaintiff desires. This subsection, by its explicit terms, seems only to *negate* the affirmative requirement of § 1396p(c)(1)(A) when assets are transferred for the sole benefit of the institutionalized individual's spouse. It does so by stating: "An individual shall not be ineligible . . . *by reason of [§ 1396p(c)(1)]*." § 1396p(c)(2) (emphasis added). This subsection does not, by its plain language, affirmatively prohibit a state from deciding to trigger ineligibility when there is a post-look-back-date transfer of assets, so long as § 1396p(c)(1) does not form the basis for that decision.

There is also the question of whether plaintiff transferred the inheritance "for the sole benefit of [his] spouse." A transfer is "for the sole benefit of [one's] spouse" if "the transfer is arranged in such a way that no individual or entity except the spouse . . . can benefit from the assets transferred in any way." Transmittal 64, Secretary of Health & Human Services, Health Care Finance Administration, State Medicaid Manual § 3257(6) (1994) ("Transmittal 64"); *see also* Ohio Admin. Code § 5101:1-39-07(F).

---

[6] This subsection correlates to Ohio Admin. Code § 5101:1-39-07(E).

[7] Section 1396p(c)(2)(B) exempts several other types of transfers besides those "for the sole benefit of the individual's spouse." *See* §§ 1396p(c)(2)(B)(ii)–(iv). Plaintiff does not allege that they are at issue here.

Here, plaintiff submits evidence that his wife used the proceeds of the inheritance to improve her home and car. Defendant presents no contrary evidence. For purposes of defendant's motion to dismiss, then, I consider the transfer to satisfy the requirement that the proceeds be used for her sole benefit.

## 2. § 1396r-5[8]

Section 1396r-5(a)(1) of Title 42 of the U.S. Code begins: "In determining the eligibility for medical assistance of an institutionalized spouse . . . the provisions of this section supersede any other provision of this subchapter (including sections 1396a(a)(17) and 1396a(f) of this title) which is inconsistent with them."

Section 1396r-5(f)(1) states:

> An institutionalized spouse may, without regard to section 1396p(c)(1) of this title, transfer an amount equal to the community spouse resource allowance [CSRA] (as defined in paragraph (2)), but only to the extent the resources of the institutionalized spouse are transferred to (or for the sole benefit of) the community spouse. The transfer under the preceding sentence shall be made as soon as practicable after the date of the initial determination of eligibility[.]

As an initial matter, § 1396r-5's supersession clause establishes that Congress desired any conflict between that subsection and any other to be resolved by application of § 1396r-5.

This subsection, moreover, explicitly mentions § 1396p(c)(1), the clause that § 1396p(c)(2)(B)(i) modifies, and directs states to disregard its limitation on transferring assets in this unique circumstance. Section 1396r-5(f)(1), however, is amenable to two distinct interpretations.

First, as plaintiff advocates, this subsection may provide an *additional*, or *separate*, basis for transfer besides that of § 1396p(c)(2)(B)(i). Under such a reading, an institutionalized spouse may

---

[8] Subsection (f) of this subsection correlates to Ohio Admin. Code § 5101:1-39-07(G).

8

transfer assets up to the CSRA limit for less than fair market value on or after the look-back date under § 1396r-5(f)(1), but he or she may *also* do so, without limitation as to amount, under § 1396p(c)(2)(B)(i) so long as the assets are for the sole benefit of the community spouse.

Second, as defendant advocates, this subsection may *supersede* and *limit* § 1396p(c)(2)(B)(i)'s transfer provision. Under such a reading, an institutionalized spouse may *only* transfer assets up to the CSRA limit for less than fair market value on or after the look-back date under § 1396r-5(f)(1). Section 1396p(c)(2)(B)(i) thus would not allow additional transfers.

Of the two interpretations, only the latter gives effect to the CSRA limitation. Section 1396r-5(f)(1) cannot provide a *separate* limitation because such a reading would render § 1396r-5's CSRA limit superfluous.[9] This conclusion is further supported by Congress's inclusion of the supersession clause in § 1396r-5, which requires states to resolve any incongruities in favor of § 1396r-5.

### B. Legislative History

The legislative history of these two provisions also supports the primacy of § 1396r-5's limitation.

---

[9] Defendant accurately observes:

> Allowing Mr. Burkholder to transfer his inheritance to his wife, while the state pays his costly nursing home bills, leads to a result that would be against the Medicaid rules and the entire purpose of the Medicaid system. The Medicaid laws are designed to protect the finite resources of the program and insure that those resources are used for the poorest individuals among us. . . . Also, [Mr. Burkholder's] explanation fails to recognize that the law he describes would not be limited just to him. It will apply to *anyone* that receives a large windfall [after being institutionalized and determined Medicaid eligible]. Using Mr. Burkholder's logic, a transfer of $130,010 is permitted, but so would a transfer of $1.3 million.

[Doc. 16, at 9].

Congress enacted Medicaid legislation "for the purpose of providing federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons." *Harris v. McRae*, 448 U.S. 297, 301 (1980). This program, however, contemplated that Medicaid would be a "payer of last resort." S. Rep. No. 99-146, at 313 (1985).

The system, however, did not function perfectly, and Congress passed the Medicare Catastrophic Coverage Act of 1988 ("MCCA"), H.R. Rep. No. 100-105 (1987), to amend numerous provisions of Medicaid. Those modifications included the enactment of § 1396r-5.

In discussing the reasoning underlying its transfers of assets limitations, Congress stated that it sought to prevent couples with an institutionalized spouse from having to deplete their assets entirely to qualify for Medicaid.

Congress simultaneously wanted to prevent an institutionalized spouse from qualifying for Medicaid by simply transferring all his or her assets to the community spouse. H.R. Rep. No. 100-105(II), at 69, 73-74; *see also Mertz* ex rel. *Mertz v. Houstoun*, 155 F. Supp. 2d 415, 421 (E.D. Pa. 2001); *Johnson v. Guhl*, 91 F. Supp. 2d 754, 761 (D.N.J. 2000). "This goal is achieved by considering all resources of both spouses over and above the CSRA to be available to pay for nursing care costs of the institutionalized spouse." *Mertz*, *supra*, 155 F. Supp. 2d at 421 (citing §§ 1396r-5(c)(1)(A) & (c)(2)).

Congress also implied that any of an institutionalized spouse's income beyond that specified in the Medicaid legislation would be used "to reduce the amount that the Medicaid program pays

to the nursing home for the care of the institutionalized spouse." H.R. Rep. No. 100-105(II), at 67 (1987).[10]

This legislative history suggests that Congress intended to allow community spouses to retain greater assets, in the form of the CSRA, than permitted before enactment of § 1396r-5, but not to permit institutionalized spouses to transfer assets above the CSRA to the community spouse while taxpayers paid the institutionalized spouse's nursing home costs.

### C. Relevant Case Law

Defendant argues that *McNamara v. Ohio Dep't of Human Servs.*, 139 Ohio App. 3d 551 (2000), and *Feldman v. Dep't of Children & Families*, 919 So. 2d 512 (Fla. Dist. Ct. App. 2005), should govern my analysis of the interaction of § 1396p and § 1396r-5.

---

[10] The full subsection of the report provides:

> *Post-eligibility application of income.*—Once an institutionalized spouse has established eligibility for Medicaid by meeting the applicable income and resource standards, some of his monthly income is reserved for his use and that of his spouse, and the rest is applied to the cost of nursing home care. These post-eligibility income rules apply whether the spouse qualifies for Medicaid as a "medically needy" or "optional categorically needy" individual. From the gross monthly income of the institutionalized spouse are deducted the following amounts, in the following order. First, there is reserved for the institutionalized spouse a personal needs allowance for clothing and other expenses of at least $25. Second, there is set aside an allowance for the maintenance needs of the community spouse. This amount, combined with the community spouse's income, if any, allows the community spouse a certain amount of income, or maintenance needs level. Third, if the institutionalized spouse has a family at home, an amount is set aside for the maintenance of the family. Finally, an amount is allowed for expenses incurred for medical care that is not covered by the State's Medicaid plan or by Medicare or other third party. *Any income remaining after these deductions is used to reduce the amount that the Medicaid program pays to the nursing home for the care of the institutionalized spouse.*

H.R. Rep. No. 100-105(II), at 67 (1987) (emphasis added).

11

Plaintiff responds that neither case is on point, because both address the interaction of the two provisions in the context of initial eligibility, not afterwards. Plaintiff further argues that *Vieth v. Ohio Dep't of Job & Family Servs.*, 2009 WL 2331870 (Ohio Ct. App.), overruled *McNamara*.[11]

---

[11] Plaintiff's contention that *Vieth* overruled *McNamara* is incorrect. The decision in *Veith* could not overrule that in *McNamara* because one Ohio Court of Appeals may not overrule another. Ohio Const. art. IV, §§ 2, 3.

The Ohio Court of Appeals' decision in *Vieth*, moreover, addresses the issue of "funds used to purchase an actuarially sound, non-revocable, non-transferable commercial annuity," which is not at issue here, and does not discuss the application of § 1396r-5(f). *Vieth*, *supra*, 2009 WL 2331870, at *8.

The court in *Vieth* relied in part on *Mertz*, *supra*. The court in *Mertz* held that an institutionalized spouse could not be subject to an ineligibility penalty for a community spouse's purchase of commercial annuities during the look-back period. 155 F. Supp. 2d at 426-28.

In so holding, the court stated:

> The transfer provisions [of § 1396p(c)(2)(B)] are not among those specifically identified in § 1396r-5(a)(1) as having been superceded. They are not inconsistent with the CSRA provisions which provide for a calculation based on assets in which either spouse has an ownership interest at the time of the application for benefits and which, viewed in conjunction with the look back provision, contemplate that some assets previously transferred may be uncountable in determining eligibility. Defendant seems to concede as much by arguing only that the sheltering of otherwise available resources is contrary to the "purpose" of the MCCA. The Secretary of HHS, however, has recognized [in Transmittal 64] that it is nevertheless permitted.
>
> After noting in Transmittal 64 that interspousal transfers should not impact eligibility since resources of both spouses are counted under the MCCA as available to the institutionalized spouse, the Secretary expressly recognized the potential for sheltering assets. . . . This is indeed achieved with the purchase of an actuarially sound irrevocable commercial annuity for the sole benefit of the community spouse.

*Id.* at 426.

To the extent that both *Vieth* and *Mertz* dealt with the purchase of actuarially sound commercial annuities, their reasoning is inapposite here. Even were they more on point, however, I find them unpersuasive given the clear statutory language of § 1396r-5.

Plaintiff is correct that neither the cases defendant cites, nor any other cases of which I am aware, address the exact situation at issue here. These cases, moreover, are not binding authority. I, nonetheless, find their reasoning persuasive.

### 1. *McNamara v. Ohio Dep't of Human Servs.*

In *McNamara*, *supra*, 139 Ohio App. 3d at 552-53, an institutionalized spouse transferred most of the couple's assets to a "spousal annuity trust," allegedly for the sole benefit of the community spouse. In determining the institutionalized spouse's initial Medicaid eligibility, the Ohio Department of Human Services ("ODHS") found that this transfer warranted an eligibility penalty. The institutionalized spouse appealed this decision.

In his appeal, the institutionalized spouse argued that the federal Health Care Finance Administration ("HCFA")'s interpretation of the Medicaid statutes at issue, in the form of Transmittal 64, differed from ODHS's interpretation, and that the former should trump the latter. The HCFA interpretation provides, in relevant part:

> The exceptions to the transfer of assets penalties regarding interspousal transfers and transfers to a third party for the sole benefit of a spouse [in § 1396p(c)(2)(B)] apply even under the spousal impoverishment provisions [of § 1396r-5]. Thus, the institutional spouse can transfer unlimited assets to the community spouse or to a third party for the sole benefit of the community spouse.
> When transfers between spouses are involved, the unlimited transfer exception should have little effect on the eligibility determination, primarily because resources belonging to both spouses are combined in determining eligibility for the institutionalized spouse. Thus, resources transferred to a community spouse are still be considered available to the institutionalized spouse for eligibility purposes.

Transmittal 64, § 3258.11.

The Ohio Court of Appeals noted in response: "HCFA is the federal agency responsible for promulgating Medicaid regulations. HCFA policy transmittals like Transmittal 64 are entitled to some deference by reviewing courts if they are consistent with the plain language and purposes of

13

the statute and prior administrative views." *McNamara*, *supra*, 139 Ohio App. 3d at 558 (citing *Johnson v. Guhl*, 91 F. Supp. 2d 754, 779 (D.N.J. 2000)).[12]

The court reasoned:

[I]f couples like the McNamaras were permitted to make unlimited transfers of resources between them pursuant to Section 1396p(c)(2)(B), the CSRA provisions contained in Section 1396r-5(f) would be rendered a nullity. Construing Section 1396p(c)(2)(B) in the manner Mrs. McNamara requests would allow persons with unlimited resources to avail themselves of Medicaid nursing home benefits.

*Id.*

The court then concluded by rejecting the institutionalized spouse's argument: "[W]e hold that pursuant to the supersession clause of Section 1396r-5(a)(1), the amount of funds that one person may transfer to his or her spouse under Section 1396p(c)(2)(B) is limited to the maximum amounts the community spouse may retain under the CSRA provision in Section 1396r-5(f)." *Id.* at 553.

### 2. *Feldman v. Dep't of Children and Families*

In *Feldman*, *supra*, 919 So. 2d at 513-14 (Fla. Dist. Ct. App. 2005), an institutionalized spouse transferred $227,000 shares of stock to her husband, allegedly for his sole benefit, as she

---

[12] While the first of the two paragraphs of Transmittal 64 cited above might appear to state otherwise, it is clear that Transmittal 64 does not intend to undermine § 1396r-5(f)'s limitation when read in context. The second paragraph of Transmittal 64 cited above suggests that the Secretary's instruction applies only in the context of transferrals occurring *prior to the initial eligibility determination*, because "resources transferred to a community spouse are still be considered available to the institutionalized spouse for eligibility purposes," Transmittal 64, § 3258.11, only prior to the institutionalized spouse's eligibility determination. *See* §§ 1396r-5(c)(2), (4).

This is not the circumstance at issue in this case, so Transmittal 64 does not speak to the case at bar. And, in any case, I need not defer to Transmittal 64 were it to recommend application of § 1396p(c)(2)(B), because § 1396r-5(f)'s limitation must trump § 1396p(c)(2)(B) for the former statute to have any meaning. As the court in *McNamara* pointed out, courts need not defer to the Secretary's interpretation when it is inconsistent with "the plain language and purposes of the statute." 139 Ohio App. 3d at 558.

simultaneously applied for Medicaid benefits. In determining the institutionalized spouse's initial Medicaid eligibility, the Florida Department of Children and Families ("FDCF") found that this transfer warranted an eligibility penalty. The institutionalized spouse appealed this decision.

The Florida District Court of Appeals agreed with FDCF's interpretation and rejected the institutionalized spouse's argument that § 1396p(c)(2)(B) allowed this transfer. In doing so, it stated: "It is clear that Congress did not intend for the provisions of section 1396p to be considered separately from those in 42 U.S.C. § 1396r-5." *Id.* at 514 (citing *Wisc. Dep't of Health and Family Servs. v. Blumer*, 534 U.S. 473, 479-80 (2002)).

The court in *Feldman* concluded:

> Similarly [to the court in *McNamara*], we consider that if couples like the Feldmans are permitted to make unlimited transfers of resources between themselves pursuant to section 1396p(c)(2)(b), the CSRA provisions contained in section 1396r-5 would be rendered meaningless and would frustrate one of the two dual goals leading to the adoption of the MCCA: To close loopholes that had previously existed in the Act allowing financially secure married couples to seek and obtain public poverty assistance.

*Id.* at 516 (citing *McNamara*, *supra*, 139 Ohio App. 3d at 556-57).

I find the reasoning of the courts in *McNamara* and *Feldman* persuasive, because it comports with the statutory language and legislative history of the provisions.

## Conclusion

Because the reasoning of these cases is persuasive, and because application of § 1396p(c)(2)(B)(i) in this context would frustrate the clear language and purpose of § 1396r-5, I hold that § 1396r-5(f) supersedes § 1396p(c)(2) where, as here, the transfer of assets from the institutionalized spouse to the community spouse occurs after the initial eligibility determination. An institutionalized spouse desiring to transfer assets to his or her community spouse, even for the

15

community spouse's sole benefit, must do so consistently with the limitation imposed by § 1396r-5(f)(1).

Because § 1396r-5(f)(1) governs and prohibits transfer of assets beyond the CSRA, Ohio Admin. Code § 5101:1-39-07—and defendant's action here under that regulation—thus comports with federal law.

For the foregoing reasons, it is hereby:

ORDERED THAT defendant's motion for summary judgment [Doc. 12] be, and the same hereby is, granted, and plaintiff's counter-motion for summary judgment [Doc. 13] and amended motion for a permanent injunction [Doc. 20] be, and the same hereby are, denied.

So ordered.

> s/James G. Carr
> James G. Carr
> Chief Judge